Stephani L. Ayers, Esq., *Pro Hac Vice pending*
Law Office of S.L. Ayers
P.O. Box 1061
Medford, OR 97501
Washington State #31610
stephani@whistleblowerdefenders.com
Tel: 813.382.7865

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

**SOPHIA LEWIS,**

    Plaintiff,

v.

**AMERICAN EXPRESS COMPANY**,

    Defendant.

Case No. _____

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

***DEMAND FOR JURY TRIAL***

Plaintiff Sophia Lewis, through her counsel, alleges as follows:

## I. <u>INTRODUCTION</u>

1.    Plaintiff, Sophia Lewis, files this complaint of whistleblower discrimination pursuant to the employee protection provisions of the Sarbanes-Oxley Act of 2002, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Plaintiff alleges that she was harassed, subjected

GOVERNMENT ACCOUNTABILITY PROJECT, INC.,
and T.M. GUYER AND AYERS & FRIENDS, PC,
ATTORNEYS AT LAW
*-1-*    ***COMPLAINT AND JURY DEMAND***

Error! Unknown document property name.

to a hostile work environment, and wrongfully terminated from her employment with Defendant American Express Company.  The termination was motivated in whole or in part because Plaintiff made protected disclosures that she reasonably believed violated the Sarbanes-Oxley Act and regulations.

## II.  JURISDICTION

2.      Jurisdiction of this action is established under 28 U.S.C. §1331 on the basis that this complaint presents federal questions under the Sarbanes-Oxley Act, 18 U.S.C. §1514A(b)(1)(B), which establishes jurisdiction in this court "if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, [by] bringing an action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy." Under subsection (b)(2)(E), either party "shall be entitled to a trial by jury".

3.      The administrative proceedings which preceded this judicial action did not implicate Seventh Amendment protections because the antifraud provisions of 18 U.S.C. §1514A do not replicate civil or criminal actions for common law fraud nor the trespass nor wrongful termination of employment "private actions" growing out of the English common law.  Because Congress created and exclusively designed §1514A with a mere contributing factor burden of proof and no requirement for proving employer intent or motivation, §1514A actions fall within

the "public rights" exception to Article III jurisdiction and have no counterparts in English common law.  Congress acted within its constitutional authority in creating the §1514A public action, requiring the defendant to litigate its defenses in the first instance within the Department of Labor by denying the defendant a jury trial; and denying the defendant a similar right to remove the action to federal court. However, once the plaintiff exercised her right to de novo review in this court, both parties now have the same right to a jury trial.

4.  Plaintiff administratively exhausted her claims under the Sarbanes-Oxley Act in the United States Department of Labor, Occupational Safety and Health Administration (OSHA), and thereafter in the Office of Administrative Law Judges (OALJ).  She filed her first OSHA complaint on Dec. 10, 2019, American Express / Sophia R. Lewis / 9-0370-20-025.   On August 13, 2020, OSHA dismissed the Dec. 2019 complaint at the request of Complainant, who asked OSHA to terminate its investigation and issue a determination so she could proceed to a hearing before the ALJ.  More than 180 days have lapsed since the filing of both of Plaintiff's DOL-OSHA complaints with no final agency decision.

5.  The administrative exhaustion requirement under SOX is governed by both the specific whistleblower provisions in 29 C.F.R. Part 1980 and the general procedural rules for hearings before the Office of Administrative Law Judges (OALJ), as outlined in 29 C.F.R. Part 18. Under 29 C.F.R. § 1980.103 and §

1980.104, SOX whistleblowers are required to file an initial complaint, which may be as simple as a phone call with the facts thereof being developed later by interviews and submissions. The statute of limitations in tolled upon any oral or written complaint, with OSHA being responsible to work with the complainant in identifying protected activity and alleged discrimination. Complainant's burden of proof is satisfied so long as the materials received and developed by OSHA show that "the adverse personnel action took place within a temporal proximity after the protected activity, or at the first opportunity available to respondent", 18 CFR 1980(e)(3). Thereafter, administrative exhaustion continues throughout the OSHA investigation, and then into the proceedings of Office of Administrative Law Judges (OALJ). 29 C.F.R. § 1980.107(a) and (b) incorporate the procedures of 29 C.F.R. Part 18 and provide that the appeal from the OSHA decision is conducted *de novo* upon a new record. 29 C.F.R. § 18.36 allows amended or supplemental complaints at any time during the administrative process with or without a motion. The OALJ may follow the FRCP 15(b)(2) that when an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." All issues actually tried in the OALJ are considered administratively exhausted, as reflected in the prehearing statements under 29 C.F.R. §18.80, the exhibits under §18.82, the hearing transcript under §18.88, the post-hearing briefs under §18.91, and the OALJ decision and order under §18.92.

6.    These complaints were consolidated into one matter before the DOL ALJ in matters nos. 2023-SOX-00010 and 2023-SOX-00011.  Via decision dated August 8, 2024, the ALJ did not find protected activity and dismissed the matter. Complainant timely filed her Petition for Review to the Administrative Review Board.

7.    After receiving the ALJ opinion and order, Plaintiff intended to seek full and thorough review of the factual and legal errors below by the Department of Labor ARB. However, upon inquiry, Plaintiff learned that ARB review was taking one to two years.  Most troubling to Plaintiff was the case of *Van v. JP Morgan Chase & Co.,* ARB Case No. 2023-0018 (November 5, 2024), which took the ARB one year to just rule on a motion to dismiss, which then resulted in a remand for further proceedings. Plaintiff then understood that waiting one or two years for the ARB to rule on her appeal could then result in three years or more of administrative litigation upon remand and further proceedings. It was upon that understanding that Plaintiff reluctantly decided to remove this case to federal court in the hopes of an expeditious decision by a jury.

8.    Plaintiff provided notice on November 4, 2024, to the DOL-ARB under 29 C.F.R. Part 1980.114 of the filing of her Sarbanes-Oxley claim in this court and invoking the *de novo* jurisdiction of this court pursuant to 18 U.S.C. § 1514A(b)(1)(B).

## III.  <u>VENUE</u>

9.      Venue lies in this United States District Court under 28 U.S.C. § 1991(b) and (c) by virtue of the fact that the Defendants do business in offices located in and/or operated in this judicial district, and a significant amount of the conduct complained of herein occurred in this judicial district.

## IV.  PARTIES

10.      Plaintiff is a citizen of the United States and a resident of the State of Arizona.

11.      Plaintiff was employed most recently as a Senior Manager in the Commercial Acquisition Group (CAG) Middle Market Sales (MMS) unit for American Express, a company covered by the anti-retaliation provisions of both Sarbanes-Oxley and Dodd-Frank.

12.      Defendant American Express Company is a publicly traded corporation headquartered in New York with various subsidiaries, including American Express National Bank, and regulated by various U.S. federal regulators including the Securities Exchange Commission (SEC), the Consumer Financial Protection Bureau, the Office of the Comptroller of Currency (OCC), and Financial Industry Regulatory Authority (FINRA).  It is a company within the meaning of 18 U.S.C. §1514A because it has issued a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. §78l) and is required to file reports under Section l5(d) of the Securities Exchange Act of 1934 (15 U.S.C. §78o(d)).

13.    The Defendant employs consultants located in offices in Arizona who regularly transact business in this state.

## V.  <u>BACKGROUND FACTS</u>

14.    AmEx hired Plaintiff in 2014 as a Business Consultant in the credit card division's CAG MMS unit in Phoenix, AZ.

15.    In February 2017, Plaintiff was promoted to Senior Manager in MMS, supervising one of two MMS-focused teams consisting of ten Business Consultants.

16.    Plaintiff was a successful manager. In 2017, her team received awards for Top Team Activation and Highest Team Spend out of 25-30 sales teams in CAG. In 2018, she received the Tribute Award based on her team's nomination.

17.    From 2014 through 2018, Plaintiff received annual performance ratings of G2 ("outperforming") and for 2018 received the highest leadership rating of L1 ("role model").

18.    The MMS unit focused on selling business charge cards and corporate cards to small businesses with revenues between $4 million and $10 million. This $4 million minimum threshold was a strict requirement, widely publicized to potential customers, the public, and thus potential shareholders, and emphasized in company training materials.

19.    MMS credit card applicants were supposedly required to supply third-party documentation verifying company revenue exceeding $4 million, either through two years of financial statements or a Dunn & Bradstreet (D&B) report. Defendant's consultants were to either get financial statements from their client to prove revenue or to verify revenue with D&B.

20.    Significant portions of Business Consultant compensation were based on commissions paid for credit card accounts successfully opened and activated. Each successful MMS account generated hundreds of dollars in commissions for both the Business Consultant and Senior Manager.

21.    In early 2019 American Express updated the application submission process to a system called dash.  American Express' intent was to allow for a more streamlined transaction and to reduce the number of manually reviewed applications.  Because dash is automated, there was no review or verification by an actual underwriter or someone in risk.  With the updated system, there were some internal errors where dash was providing "false" positives. Some consultants took advantage of this by submitting several applications that they knew were below $4 million, in an effort to receive a positive decision.

22.    When this happened, the consultant would contact the customer and say the customer was approved and set up an appointment to order cards.  The customer company would then order their cards and the consultant would call the customer company and ask that they just put a small transaction on the card to

"make sure everything is working." However, the consultant's reason for doing this was to make sure the consultant received the second portion of his or her commission and avoid any possible "claw back" for lack of activation.

## VI. PROTECTED ACTIVITY

23.    Plaintiff made a number of protected reports, including the following specific reports, and she continued communications in support of the following disclosures:

### A.  April 2018 Disclosures

24.    In early 2018, Plaintiff learned from her team and company colleagues that CAG salespeople on another team were receiving large commissions for opening MMS business card accounts for companies with less than $4 million in revenues, in violation of strict company requirements.

25.    The team was led by Senior Manager Wiley King, who permitted his team to submit MMS applications for unqualified businesses below the $4 million threshold, resulting in thousands of dollars in commissions paid under false pretenses.

26.    In April 2018, Plaintiff reported King's and his team's misconduct to AmEx management, including Director Maryam Biglou-Enders. Defendant Director Biglou-Enders had been asked to perform a three-year lookback in Feb 2017 and as a result discovered hundreds of names where AmEx falsified fees, did not tell individuals they were running their credit, and/or took advantage of

customers, due to age, language barriers, or lack of knowledge. Management investigated and confirmed Lewis' disclosures that King's team had submitted credit card applications for unqualified businesses without supporting documentation.  Director Biglou-Enders confirmed Plaintiff's reports of deceptive sales practices and noted the harm due to not only the falsification of the customer's revenue but also the influence to get additional cards, leading to additional fees. Biglou-Enders determined Plaintiff's protected disclosures shared some level of consistency with the wrongdoing identified in the 2017 lookback.

27.    Due at least in part to Plaintiff's disclosures and the subsequent investigation, American Express changed its formula for awarding commissions to MMS teams, ostensibly to discourage further gaming of the compensation system.

28.    Despite the investigation confirming wrongdoing, AmEx took no disciplinary action against King. Instead, King was promoted to Director while the misconduct investigation was still underway, surprising AmEx managers who believed there were stronger candidates.

29.    The fraudulent practices continued after King's promotion. His team continued to open MMS credit card accounts for businesses below the $4 million threshold through AmEx's automated Dash system, which automatically opened many accounts without manual review.

### B. June 2019 Disclosures to American Express

30.    On June 7, 2019, Plaintiff met with American Express' General Counsel Office staff, Senior Counsel Shawn Hynes and disclosed that King was continuing to condone wrongful sales practices generating large commissions for his team.  Plaintiff warned Hynes that she feared discrimination or retaliation from King for reporting his misconduct.

31.    On June 12, 2019, Plaintiff told Hynes and GCO paralegal Judith Devieux that she had reported her concerns about King as well as previous retaliation previously to HR's Michelle Lloyd and Jeanne Stout.

32.    On June 26, 2019, when AmEx announced King's selection as Director of MMS making him Plaintiff's supervisor, Plaintiff emailed Hynes stating: "This is exactly why I was concerned about coming forward and providing both HR and you information regarding [King's] unethical sales practices that he committed for financial gain. I also voiced my concern with retaliation and now my concerns have come to fruition."  She also disclosed a conflict of interest in that King's brother-in-law also worked in the Middle Market segment where King was now director and at AmEx a family member cannot report directly or indirectly to another family member.  Hynes responded and said Plaintiff's concerns were being taken seriously and that he would connect with the appropriate people to look into it further.

33.    That same day, Director of U.S. Employee & Labor Relations Jeanne Stout instructed Sandra Diaz to access Plaintiff's work email account (without

Plaintiff's knowledge) to look for various emails on Stout's instruction, but starting with any emails to or from Maryam Biglou-Enders, the same Director to whom Plaintiff had made her reports of AmEx wrongdoing starting in April 2018.

### C. September-October 2019 Disclosures

34.    On September 7, 2019, Plaintiff sent an email to AmEx attorney Hynes and HR Stephanie Howard, who reported to Stout, stating that she was reaching out to file a formal complaint of harassment, targeting, and bullying by King, stating: "Ever since I advised HR of [King's] illegal practices for financial gain and now that he has become my direct leader, he has made it his mission to harass and target me." She described various efforts and communications from Mr. King causing a stressful and hostile work environment for her and her team.

35.    On September 26, 2019, Plaintiff filed a detailed complaint through Defendant's ethics hotline, EthicsPoint, documenting the ongoing sales practice violations, discrimination and retaliation.

36.    On September 27, 2019, Plaintiff wrote to David Rabkin, Executive Vice President and General Manager, US Small and Mid-size Enterprises, to ask for assistance with the bullying and harassment resulting from her ongoing complaint regarding unethical and questionable sales practices.

37.    On October 10, 2019, Diaz again pulled emails from Plaintiff Lewis' account, without her knowledge, including emails others sent to Plaintiff as a BCC and emails Plaintiff sent to EVP/GM Rabkin.

38.     On October 16, 2019, Plaintiff met with Julie D. Tomich, CAG Senior Vice President and General Manager, to disclose the continuing deceptive practices causing AmEx to improperly pay commissions to salespeople who opened MMS accounts without required revenue verification documentation for businesses below the $4 million threshold.

39.     On October 17, 2019, Plaintiff provided detailed information identifying twelve recently opened problematic MMS accounts. For each account, Plaintiff documented:

a. The business had revenues below the required $4 million threshold;

b. The account lacked required financial statements or D&B reports;

c. The account showed no activity or "first dollar" usage;

d. The application dates and details showing the accounts were recently opened.

In providing this documentation, Plaintiff noted: "Sadly, this is the same behavior that took place last year that I, along with others, brought to everyone's attention."

40.     On October 30, 2019, Plaintiff sent a follow-up email to Tomich and four other managers identifying fourteen additional problematic accounts, specifically documenting:

a. The $4 million revenue requirement "has been a standing 'requirement' for a number of years";

b. One consultant "consistently has submitted accounts that fall very short of the minimum guidelines";

c. The practice was "putting the organization, department and [Business C]onsultants at risk should the client default and its later determined they never met the original guidelines".

41.    Plaintiff reported that one account used a fraudulent D&B number belonging to an Apple retail store in Fresno, California while purporting to be for a financial services company in Greenbelt, Maryland.  As a result, the application and/or account contained false information.

42.    On October 22, 2019, Plaintiff wrote to Michelle Rasmusson about documented proof of accounts submitted April 2019 under $4MM violating the requirement, despite the published requirements and the external website to the public and shareholders posting minimum requirements of $4MM revenue.

43.    In her October 30, 2019 email, Plaintiff Lewis warned management: "This is putting the organization, department and [Business C]onsultants at risk should the client default and its later determined they never met the original guidelines."

**D.  Ongoing Internal Investigation of Disclosures**

44.    On November 1, 2019, Tomich confirmed to Plaintiff that Plaintiff's concerns had been referred to AmEx's Internal Auditing Group (IAG) for review.

45.    On November 4, 2019, Tomich informed Plaintiff that she and Steve

Lindstrom, CAG Vice President, had met with internal audit that morning and were told the investigation would "probably require two more weeks of work to complete."

46.    On November 11, 2019, Plaintiff met with Mr. Lindstrom, and to her surprise, Ms. Stout was at the meeting.  Plaintiff recorded the meeting in order to protect the information she was disclosing regarding potential violations of Sarbanes Oxley.  Mr. Lindstrom sent Plaintiff a follow up email summarizing the meeting inaccurately.  Plaintiff believed Lindstrom email falsely suggested that she had admitted and agreed she had been insubordinate and needed to improve her behavior.   No one told Plaintiff that she was falling short of American Express standards.

47.    On November 19, 2019, in response to criticism about her disclosures, Plaintiff wrote to management: "There were no ill intentions; I am truly trying to prevent what happened to Wells Fargo at American Express. And I'm not alone, there are so many of us trying to help, unfortunately the ones that have spoken up against [King] are no longer here, or nothing happened with their investigations so now my colleagues are fearful that they will lose their job, or end up on counseling or hurt their brand if they continue to push this topic."  Plaintiff forwarded this email to her personal email to preserve evidence for federal regulators and to protect the integrity of the information and her as a whistleblower.

### E. <u>December 10, 2019 OSHA Complaint</u>

48.    On December 10, 2019, Plaintiff filed an OSHA complaint regarding her protected disclosures described above and reporting her discrimination and retaliation concerns.  OSHA recorded:

> On or about June 20, 2019, Ms. Lewis was denied a promotion and on or about November 12, 2019, she was disciplined in retaliation for her complaints about employees submitting applications for corporate credit card accounts for customers that did not meet qualifications and using false signatures and false financial information on corporate credit card applications. Ms. Lewis also contends that she has been subjected to harassment and intimidation because of her complaints.

### F. <u>Preservation of Evidence</u>

49.    Plaintiff engaged in further protected activity by securing and forwarding evidence that was provided to federal regulators.

50.    To preserve evidence of the fraudulent practices and management's knowledge of them, to protect the integrity of the information, as well as secure evidence to provide to federal regulators, Plaintiff forwarded key emails to her personal account.  This is permitted by law, but also in accordance with American Express' internal whistleblower policy, American Express Management Policy (AEMP) 17, which states at paragraph 4.2: "Individuals who have reason to believe that a serious breach of Company policy or law has occurred must retain all documents that could be relevant to an investigation of the matter, including information stored in electronic form such as e-mails."

51.    The preserved emails included:

a. The July 29, 2019 email documenting King's reversal of employee discipline without notice to Plaintiff;

 b. Her October 17, 2019 email to Tomich documenting 12 fraudulent accounts;

 c. Her October 30, 2019 email documenting 14 additional fraudulent accounts and the misuse of D&B numbers.

52.    Plaintiff provided copies of these preserved emails to Defendant and OSHA on January 6, 2020, as supporting documentation for her OSHA complaint.

**F. <u>The Fraudulent Practices Were Material and Significant</u>**

53.    The seriousness of the fraudulent practices reported by Plaintiff is demonstrated by:

 a. A March 1, 2020 Wall Street Journal article confirming investigations into wide-spread sales practice abuses at AmEx involving small business credit cards, and

 b. At least six federal agency investigations of AmEx's sales practices, including:

 i. The Office of the Comptroller of the Currency

 ii. The Office of Inspector General for the Federal Deposit Insurance Corporation

 iii. The Federal Reserve OIG

 iv. The U.S. Justice Department's Civil Division

v. The Brooklyn U.S. Attorney's Office (criminal grand jury

investigation)

vi. The U.S. Consumer Financial Protection Bureau

54.     These investigations concern the same types of "aggressive and

misleading sales tactics to sell cards to business owners" that Plaintiff repeatedly

reported to Defendant management.

55.     In its February 2021 10-K filing, American Express made the

following representations without making accurate representations as to the known

issues:

> Beginning in May 2020, we began responding to a regulatory review led
> by the OCC and the Department of Justice Civil Division regarding
> historical sales practices relating to certain small business card sales. We
> also conducted an internal review of certain sales from 2015 and 2016
> and have taken appropriate disciplinary and remedial actions, including
> voluntarily providing remediation to certain current and former
> customers. *** We are cooperating with all of these inquiries and have
> continued to enhance our controls related to our sales practices. We do
> not believe this matter will have a material adverse impact on our
> business or results of operations.

## VI.     <u>DISCRIMINATORY ACTIONS</u>

56.     After Plaintiff began making protected disclosures in 2018 and

continuing through 2020, AmEx subjected her to increasingly severe adverse

actions.

57.     In June 2019, Plaintiff was passed over for promotion to Director of MMS.  The position was instead given to King - the subject of her whistleblowing disclosures, who then became her supervisor.

58.     King demonstrated repeated hostility toward Plaintiff, including micromanaging her team and sending derogatory messages about her.

59.     HR and Legal accessed her work email account multiple times throughout 2019-2020 with no legitimate purpose, to view emails related to or about her whistleblowing.

60.     In February 2020, AmEx placed Plaintiff on a three-day suspension, purportedly for violating email policy by forwarding two work emails to her personal account. In fact, Plaintiff is free to and expected to preserve evidence of wrongdoing as permitted under Sarbanes-Oxley law and Defendant's whistleblower policy.

61.     After her suspension, one of the subjects of her whistleblowing who became her supervisor, King, gave Plaintiff Lewis the lowest possible annual leadership rating (L4) for 2019, despite her receiving the highest rating (L1) the prior year. She received no advance warning or coaching or opportunity for improvement of the alleged shortcomings.

62.     Via letter dated August 20, 2020, American Express terminated her employment. Defendant's stated basis for the termination was that she sent

confidential information from her work email to her personal email and was

untruthful when interviewed as part of the company's investigation.

## VIII.   NEXUS AND PRETEXT

63.    Defendant's actions followed in close temporal proximity to Plaintiff's

protected disclosures, one or more of which was a contributing factor to those

adverse actions.

64.    Defendant had never previously formally disciplined Plaintiff and did

not follow their progressive disciplinary policy, but instead went outside their

normal disciplinary tract to terminate Plaintiff.

65.    Defendant's stated reasons for their adverse actions were unworthy of

belief and lacked credibility.

## IX.   FEDERAL CAUSES OF ACTION:

### DISCRIMINATION IN VIOLATION OF SECTION 806 OF THE SARBANES-OXLEY ACT OF 2002

66.    Plaintiff realleges the Paragraphs above.

67.    The complaints, disclosures, and information provided by Plaintiff to

her managers, and regulators including the U.S. Department of Labor, as set forth

above, constituted protected activity under the employee protection provisions of

Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1) and (2), which

prohibits any adverse action against an employee who has taken, or was preparing

to take, action "to provide information \*\*\* regarding any conduct which the employee reasonably believes constitutes a violation of \*\*\* any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders\*\*\*".  The complaints, disclosures, and information set forth above and discussed below, were considered by the Defendant in all adverse actions taken against her, and generally but not exclusively falling into the following five categories of business practices:

### A.  **Fraudulent Commission Practices:**

68.     American Express engaged in fraudulent commission practices that violated Section 806 of the Sarbanes-Oxley Act (SOX). These practices involved manipulating internal processes to inflate commissions earned by sales staff. Specifically, sales representatives submitted falsified or incomplete credit card applications, intentionally bypassing necessary compliance checks and company standards. This fraud was systemic, facilitated by the organization's prioritization of sales performance over regulatory and ethical compliance. Section 806 protects employees who report activities that involve federal mail, wire, bank, or securities fraud, as well as violations of laws intended to protect shareholders and regulations of the Securities and Exchange Commission (SEC). The practices Lewis exposed violated these provisions in multiple ways.

69.     First, the fraudulent commission scheme constituted wire fraud under federal law. By using electronic communication systems to process and approve

falsified credit card applications, employees committed fraud through
misrepresentation and deceit. These transactions directly involved wire
communication, which is explicitly covered under the statutes SOX references.
Second, this practice also violated laws protecting shareholders because the
fraudulent commissions inflated the company's sales and revenue figures, which
were reflected in its financial statements. These inaccuracies deceived shareholders
and investors, giving a false impression of the company's financial health and
operational success. Such misrepresentation of earnings violates SEC regulations
requiring accurate and transparent reporting.

70.    American Express's failure to maintain effective internal controls, as
required under SOX, further compounded the violations. Section 806 relies upon
effective and reliable internal compliance systems to prevent fraudulent activities
that could harm shareholders or mislead regulators. The company's internal
mechanisms failed to detect or deter fraudulent commission practices, allowing
them to persist unchecked. By prioritizing sales quotas and incentivizing unethical
behavior, the company created an environment where fraud could thrive. This
directly contravened the intent of SOX to protect investors and ensure corporate
accountability.

**B. <u>Violations of Corporate Card Application Practices</u>:**

71.    Systemic violations of corporate card application standards existed
wherein American Express employees knowingly submitted applications that failed

to meet the company's revenue threshold requirements. Specifically, these applications often involved businesses with less than $4 million in annual revenue and lacked proper financial verification. Section 806 of SOX protects whistleblowers who expose fraud that harms shareholders or violates SEC regulations. These violations of application standards fall squarely within the scope of the law.

72.    The fraudulent submission of ineligible applications constituted wire fraud under federal law. Employees used electronic communication systems to submit and process these applications, knowing they contained false or incomplete information. Such actions violated the legal standard for wire fraud, which involves intentional deceit through electronic communication to achieve financial gain. Additionally, the reckless or deliberate approval of ineligible applications contributed to the company's financial misrepresentation, violating federal laws related to fraud against shareholders. By including these fraudulent applications in reported customer acquisition metrics and revenue, American Express misled investors about its financial performance. These actions compromised the accuracy of the company's financial statements, a violation of SEC rules requiring truthful and complete disclosures.

73.    The failure to adhere to corporate card application standards also demonstrated significant lapses in internal controls. SOX mandates that companies implement systems to detect and prevent fraudulent activities. By allowing non-

compliant applications to proceed, American Express violated these requirements, exposing shareholders to financial risks and regulatory scrutiny. The systemic nature of these violations demonstrate the company's failures in enforcing its own policies, which are adopted to comply with Section 806, creating an environment where fraud was normalized and incentivized.

### C.  Managerial Approval of Non-Compliant Applications Practices:

74.    Managers at American Express knowingly approved non-compliant credit card applications, exacerbating the company's fraudulent practices. These applications lacked required financial verification and eligibility checks, such as validation through Dun & Bradstreet reports. Managerial complicity in these practices violated Section 806 of SOX by enabling fraudulent activities that harmed shareholders and violated federal fraud statutes.

75.    Managerial approval of fraudulent applications constitutes wire fraud because it involves the use of electronic systems to facilitate deceitful practices. By signing off on applications that failed to meet eligibility criteria, managers directly participated in fraudulent schemes designed to inflate sales metrics and commissions. This conduct also violated laws protecting shareholders, as the fraudulent applications distorted the company's financial performance metrics. Investors rely on accurate and truthful reporting to make informed decisions, and managerial approval of fraudulent applications undermined the integrity of American Express's financial statements, violating SEC regulations.

76.    The complicity of management demonstrated significant failures in corporate governance and internal controls, both of which are central to SOX compliance. Section 806 requires effective and reliable systems to prevent fraud and ensure accountability at all levels of an organization. By endorsing non-compliant practices, managers at American Express not only failed to uphold these Section 806 and SEC standards but actively contributed to systemic fraud, demonstrating a willful disregard for regulatory and ethical obligations.

### D.  <u>Systematic Bypass of Financial Verification Standards Practices</u>:

77.    American Express employees systematically bypassed financial verification protocols to expedite the approval of credit card applications. By recklessly or deliberately circumventing verification standards, employees used electronic systems to process applications containing false or incomplete information. These actions meet the criteria for wire fraud, as they involved intentional misrepresentation through electronic communication for financial gain. Furthermore, bypassing financial checks distorted the company's reported metrics, leading to inflated customer acquisition and revenue figures. This misrepresentation constituted fraud against shareholders by providing a false basis for evaluating the company's financial health. SEC regulations require companies to maintain accurate and transparent reporting, and these practices directly violated those mandates.

78.     The systemic nature of the bypass also highlighted failures in internal controls, under which Section 806 mandates that companies establish and enforce policies to detect and prevent fraudulent activities. American Express's failure to ensure compliance with its financial verification protocols demonstrated significant recklessness, exposing shareholders to unnecessary risks and regulatory scrutiny. The deliberate nature of these bypasses indicates a broader culture of non-compliance within the organization, further exacerbating the violations.

### E.  Misuse of Internal Resources to Facilitate Fraud Practices:

79.     American Express employees and managers misused internal systems and resources to facilitate fraudulent credit card applications. This included manipulating application data and exploiting system vulnerabilities to bypass compliance checks. These practices violated Section 806 of SOX by constituting wire fraud, defrauding shareholders, and breaching SEC regulations.

80.     The misuse of internal systems facilitated fraudulent activities by enabling employees to process applications that should have been flagged or rejected. This conduct meets the legal standard for wire fraud, as it involved intentional deceit through electronic communication. Additionally, these fraudulent applications were included in the company's reported metrics, inflating revenue and customer growth figures. This misrepresentation constituted fraud against shareholders, as it distorted the company's financial disclosures and harmed investor decision-making.

81.    The exploitation of company resources underscored failures in corporate governance and internal controls. Section 806 requires companies to implement effective systems to detect and prevent fraud, and the systemic misuse of internal systems at American Express demonstrated a failure to meet this standard. By allowing employees and managers to exploit these resources, the company not only facilitated fraudulent activities but also violated its obligations under SOX to maintain transparency and protect shareholders from financial risks.

82.    As to the above listed unlawful or fraudulent business practices, the Complainant's protected disclosures fall into the following disclosure categories:

**A. <u>Disclosure of Application Violations:</u>**

83.    Plaintiff engaged in protected activity when she objected to the fraudulent practice of applying for credit cards for businesses that did not meet the requisite income requirements.   Plaintiff explained to her supervisors, lawyers, investigators, regulators and the media as a channel for disclosure to regulators the reasons she was objecting to said practice.

84.    Plaintiff engaged in protected activity when she communicated information to the Wall Street Journal that featured her allegations.   Such communications constituted a preliminary step in the process of disclosing wrongdoing that could result in initiation of a formal "proceeding" under SOX §1514A(2).

85.    Plaintiff made disclosures that she believed constituted Wire Fraud (18 U.S.C. § 1343).  Defendant used interstate wire communications to obtain money by false pretenses with an intent to defraud. Business Consultants submitted false revenue information via electronic systems. Applications claimed businesses had $4M+ revenue when they did not.  American Express used interstate electronic communications (including the Dash system) to process applications.  Intent is shown through systematic misrepresentation to obtain commissions.  Employees knowingly exploited automated Dash system.  Applications were submitted electronically across state lines.  The system approved accounts without proper verification, and the system was used to circumvent manual review requirements.  Additionally, a wrong D& B number was used in an application, which meant the application was submitted with false financial information.

86.    Plaintiff made disclosures that she believed constituted Mail Fraud (18 U.S.C. § 1341), the use of the U.S. mail to execute a scheme with intent to defraud.  Physical cards were mailed through the U.S. mail system to unqualified businesses.  Supporting documents for applications and false financial statements were also sent via mail.  Applications were processed and approved based on false information.

87.    Plaintiff's disclosures also relate to Securities Fraud (18 U.S.C. § 1348), a scheme to defraud involving securities, material misrepresentation or omission and connection to purchase/sale of securities. As a result of Defendant's actions and /or failure to remediate, there was false financial reporting as a result of

inflated sales figures from fraudulent accounts, misrepresented quality of Defendant's credit card portfolio and impact on shareholder value through false growth metrics.  Additionally, risk was concealed as American Express failed to disclose systematic circumvention of credit standards, concealed improper sales practices from shareholders and misrepresented internal controls effectiveness.

### B. Disclosure of Internal Controls Failures

88.    Plaintiff's disclosures implicate bookkeeping and record violations under 15 U.S.C. § 78m, with the Defendant's failure to maintain accurate books and records, false or misleading financial statements, and inaccurate reporting of material information.  Commission payment records indicate payments were made on fraudulent qualifications, inaccurate recording of legitimate sales versus fraudulent ones, and a false basis for compensation payments.  Records showed qualified accounts that were actually unqualified, inaccurate reporting of customer qualification metrics, and false documentation of revenue verification.

89.    The materiality and/or significance of these violations is supported by: at least six federal agencies investigating similar practices, Wells Fargo receiving a $100 million fine for similar practices, and the WSJ investigations and reports confirming the systemic nature of the practices.

90.    The most fundamental protection against false or misleading financial practices or omissions as to Defendant's results of operations, profitability, fraud detection, and shareholder fraud is the company's maintenance of a reliable and

effective system of internal controls. The Defendant is required by securities law, including under SOX Sec. 404, and regulations to implement internal control policies.

91.    In its SEC filings and public statements, the Defendant expressly and/or impliedly represented that they had effective internal controls and had disclosed all significant deficiencies in the design or operation of internal controls which could adversely affect its ability to accurately record, process, summarize and report financial data and regulatory compliance.

92.    Plaintiff's disclosures and criticism to Defendant's officials, as set forth in this complaint, establish a reasonable belief that all such disclosures have not fully and truthfully been made to the external auditors, the SEC and shareholders.

93.    The Dash system allowed automatic approvals without proper verification.  There was a lack of effective oversight on revenue verification, and management was aware of the control circumventions.  This constituted a failure to maintain effective internal controls and demonstrated material weaknesses in control systems.  American Express still certified the effectiveness of their controls despite these known issues, failed to disclose material weaknesses in approval systems, and continued their certifications despite awareness of systematic abuse.

## C. <u>Disclosure of Information to a Section 1514A(a)(1)C) Investigation</u>

94.     The DOL's investigation into Plaintiff's complaint and Defendant's internal investigation thereof constituted an "investigation" to which Plaintiff had "provided information", and was about to provide more information, within the meaning of 18 USC § 1514A(a)(1)(C).  Discrimination for her intended or actual participation therein was unlawful.  It is an independent violation of the Act for defendants to discriminate against Plaintiff during or because of her initiation of and participation in said investigations and proceedings.

95.     Plaintiff's protected activity was a contributing factor in the Defendant's above referenced adverse actions against her, to wit, placing her on suspension and subsequently terminating her employment.   Such consideration of her protected activity was in violation of Section 806 of the Sarbanes-Oxley Act. American Express cannot establish by clear and convincing evidence that the adverse actions would have been taken in the absence of her protected activities.

## X.  <u>DAMAGES AND INJURY</u>

96.     As a result of Defendant's discriminatory actions against her, Plaintiff has suffered loss of her employment and career, loss of income, loss of benefits and insurance, loss of promotions, and significant damage to her career and career path, and severe emotional, mental, and physical distress and anxiety and humiliation.

## XI.  <u>REQUEST FOR RELIEF</u>

97.     Under any count, Plaintiff respectfully requests that she be awarded the following relief:

a.     Reinstatement to her employment, and if reinstatement is not ordered, then front pay for a period of at least ten years;

b.   Upon reinstatement, an injunction to the Defendant to remediate the hostile work environment, harassment and intimidation to which the Plaintiff was subjected;

c.   Back pay for all lost wages, income, and benefits;

d.   Economic damages for injury to Plaintiff's career, professional reputation and earning capacity, in the amount of at least $1,000,000, or an amount to be determined at trial;

e.   $1,000,000 in non-economic damages for mental and emotional distress, embarrassment and humiliation, or an amount to be determined at trial;

f.   Expungement of written warnings, reprimands, negative performance appraisals and other derogatory information and references which have been placed in the Plaintiff's personnel file or otherwise in Defendant's possession, custody or control.

g.   Posting of a notice to Defendant's employees indicating that they have been ordered to comply with the whistleblower provisions of the Sarbanes Oxley Act and to make appropriate restitution to the Plaintiff;

*-32-*   **COMPLAINT AND JURY DEMAND**

h.  Reasonable costs and attorney's fees, together with all other relief available from law and equity, including the costs of expert witnesses.

## XII.  PLAINTIFF DEMANDS A TRIAL BY JURY.

Plaintiff requests that this matter be tried to a jury.

Respectfully submitted this 26th day of November 2024,

_____s/Stephani L. Ayers_____
Stephani L. Ayers,  *Pro Hac Vice pending* (Washington #31610)
Law Office of S.L. Ayers
4701 Admiral Way SW #276
Seattle, WA 98116
(813) 382-7865
stephani@whistleblowerdefenders.com

On behalf of the Government Accountability Project
1612 K St., NW #808
Washington, DC 20006
(202) 408-0034

Attorneys for Plaintiff